IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| RICHARD PHELPS EDWARDS, | Cause No. CV 15-17-BLG-SPW-CSO |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| DAVID BERKEBILE; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

On March 18, 2015, Petitioner Richard Phelps Edwards filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. Edwards is a state prisoner proceeding pro se.

On June 12, 2015, the Court ordered Respondents ("the State") to file documents from the record created in state court and gave Edwards an opportunity to respond. Order (Doc. 6) at 1-2 ¶ 2, 3 ¶ 5. The State complied on July 10, 2015 (Doc. 11).

On July 27, 2015, Edwards requested an order directing the State to file the transcript of a pretrial motion hearing held on December 21, 2009 (Doc. 12). This request, construed as a motion, is addressed below in Part IV.F, with Edwards' sixth claim for relief.

# I. Preliminary Review

The petition is subject to preliminary review. *See* Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("§ 2254 Rules"). If, on the face of the petition and any attached exhibits, it is not clear whether petitioner is entitled to relief, the judge "must order the respondent to file an answer, motion, or other response . . . or to take other action." As noted, the Court directed the State to file certain documents from the record of the proceedings in state court.

A petitioner is "expected to state facts that point to a real possibility of constitutional error." Rule 4, § 2254 Rules, advisory committee's note (1976) (quotation marks omitted) (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970)); *see also Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) (Schroeder, C.J., concurring). "[I]t is the duty of the court to . . . eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, § 2254 Rules.

Considering the claims in Edwards' federal petition in light of the state court record, it is clear that he is not entitled to relief.

# II. Background

Edwards was convicted in connection with the shooting death of Daniel Lavigne. Lavigne was found dead just outside his front door on May 13, 2002. The cause of death was a single gunshot wound to the head.

The ensuing investigation produced little evidence until April 2009, when Edwards' ex-wife, Sherry Edwards ("Sherry"), contradicted her previous statements and said she saw Edwards kill Lavigne and knew that he disposed of the handgun, though she did not know where. Edwards was charged in Montana's 22nd Judicial District Court, Stillwater County, with one count of deliberate homicide and one count of tampering with evidence.

Trial commenced on March 19, 2010. The State introduced no forensic evidence connecting Edwards to the murder. Its case was based on the consistency among Sherry's April 2009 account of how Edwards approached and shot Lavigne, the angle of Lavigne's fatal wound, and the location and angle of a bullet and bullet hole found at the scene; testimony about other persons who might have had a motive to kill Lavigne but against whom no other evidence was found; and testimony from three witnesses – two relatives of Sherry and an ex-girlfriend of Edwards – who each heard Edwards say he killed a man in Montana. Two of those witnesses also testified that Edwards said he took steps to conceal the gun from law enforcement. Edwards' own testimony was consistent with Sherry's original reports to law enforcement. After hearing five days of testimony, the jury returned guilty verdicts on both counts.

Edwards appealed, arguing that Sherry should not have been permitted to testify under Montana's spousal privilege; that one of his trial lawyers was

ineffective because she said, in front of the jury, she was not prepared to cross-examine Sherry; and that the district court erred in failing to inquire into Edwards' post-trial, *pro se* request for new counsel. On August 30, 2011, the Montana Supreme Court rejected his arguments and affirmed his convictions. *State v. Edwards*, 260 P.3d 396, 399 ¶¶ 1-5 (Mont. 2011). A petition for rehearing was denied on September 27, 2011. Edwards' conviction became final on December 26, 2011. *See Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012).

On March 14, 2012, Edwards filed a petition for postconviction relief in the trial court. *See* Case Register Report (Doc. 11-14) at 1 Entry 1. His initial, *pro se* petition alleged several claims. Counsel were appointed to represent him. He filed an amended petition alleging that compelling evidence of his actual innocence was not adequately presented at trial and that trial counsel's cross-examination of Sherry was ineffective. When the trial court denied relief, Edwards appealed. He asserted that trial counsel was ineffective and that he should have been granted an evidentiary hearing. On January 13, 2015, the Montana Supreme Court rejected his claims and affirmed the trial court's denial of postconviction relief. *Edwards v. State*, No. DA 13-0841, slip op. at 5 ¶¶ 10-11 (Mont. 2015) (unpublished).

Edwards timely filed his federal habeas petition on March 16, 2015. Pet. (Doc. 1) at 21; *Houston v. Lack*, 487 U.S. 266, 270-71 (1988) (establishing prison mailbox rule).

4

### III. Claims

Edwards alleges, first, that he did not kill Lavigne, and that an affidavit from an investigator proves he had no opportunity to do so. Pet. at 5; Br. in Supp. (Doc. 2) at 8-10.

Second, Edwards alleges that trial counsel were ineffective in certain respects. He contends that his trial counsel were not prepared to cross-examine Sherry and failed to persuade the jury that her inconsistent statements were not sufficient evidence to prove him guilty beyond reasonable doubt. He claims counsel should have objected to the testimony of the witnesses who claimed Edwards said he killed a man in Montana. He claims counsel should have called one defense expert to establish that Edwards would have been bloodied by "blowback" if he had shot Lavigne as Sherry said and another expert to testify that it might have been impossible to match the deformed bullet found at the scene to any gun. Pet. at 7; Br. in Supp. at 10-14.

Third, Edwards avers that Sherry's testimony violated his spousal privilege. Pet. at 8.

Fourth, Edwards claims that his *pro se* motions for a new trial and new counsel were not acknowledged by the court or his counsel. *Id.* at 10; Br. in Supp. at 14-17.

Fifth, Edwards alleges that appellate counsel was ineffective because he did

not present two issues on direct appeal: first, the trial court erred in sustaining a hearsay objection that prevented him from introducing a statement by another suspect, Randy Ebberson, that he killed Dan Lavigne; and second, the trial court erred in denying his motion for judgment of acquittal. Pet. at 12; Br. in Supp. at 17-18.

Sixth, Edwards contends that the prosecution and law enforcement engaged in misconduct by coaching Sherry's testimony. Pet. at 13; Br. in Supp. at 19-22.

Seventh, Edwards claims that counsel's ineffective assistance and the prosecution team's misconduct cumulatively prejudiced him. Pet. at 14; Br. in Supp. at 22.

Eighth, Edwards avers that he was denied an evidentiary hearing on his postconviction petition in state court. Pet. at 15; Br. in Supp. at 23-24.

Ninth, Edwards alleges the state court denied postconviction relief based on an unreasonable determination of the facts presented in state court. Pet. at 16; Br. in Supp. at 24-27.

Tenth, Edwards claims his postconviction counsel were ineffective because they appealed only the trial court's denial of an evidentiary hearing, not any other issue. Pet. at 17; Br. in Supp. at 27-28.

## IV. Analysis

### A. Claim 1: Actual Innocence and Sufficiency of the Evidence

### 1. Actual Innocence

Edwards' first claim asserts that he did not kill Lavigne. He relies on an affidavit from investigator Ken Ewalt, filed in state postconviction proceedings, averring that evidence presented at trial left no opportunity for Edwards to commit the crime. *See* Ewalt Aff. (Doc. 2-1 at 40-46 ¶¶ 6-32).

But "[f]ederal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). "Once a defendant has been afforded a fair trial[1] and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera v. Collins*, 506 U.S. 390, 399 (1993). The Court will assume that it is unconstitutional for a State to hold in custody a person who demonstrates he is innocent of the crime of conviction. *Id.* at 400-02. Even so, because a jury found Edwards guilty, he now has the burden of proving that no rational juror could find him guilty beyond reasonable doubt of killing Dan Lavigne and concealing the gun he used to do it.[2]

Investigator Ewalt's affidavit is based on two items of evidence presented at

---

[1] Edwards' other claims for relief allege he did not receive a fair trial. They must be dealt with on their own merits. In this claim, Edwards asserts that he is entitled to federal habeas relief because he is innocent.

[2] The *Herrera* Court did not expressly decide what the burden of proof should be, but one year later, in *Schlup v. Delo*, 513 U.S. 298 (1995), the Court held that a *Herrera* claim would have to meet a higher standard than a *Schlup* claim. *Schlup* required the petitioner to show, by a preponderance of the evidence, that no reasonable juror would convict him in light of the new evidence as well as all the other evidence relevant to the case. *See Schlup*, 513 U.S. at 316, 327-28. Therefore, it appears the *Herrera* standard requires a petitioner to show clear and convincing evidence that no reasonable juror would convict him. But Edwards is not entitled to relief under either standard.

trial. First, Joy Beers testified that she saw Lavigne driving his van in Columbus, Montana, at 5:15 p.m. on May 13, 2002. Ewalt drove the route Lavigne would have taken home after Beers saw him in Columbus at 5:15. He concluded that Lavigne could not have arrived at his house before 5:49 p.m. Ewalt Aff. (Doc. 2-1 at 40-41 ¶¶ 6-12).

Second, a grocery store receipt showed that Edwards and Sherry purchased items at a grocery store in Columbus at 6:24 p.m. the same day. Sherry testified that after Edwards killed Lavigne, she and Edwards drove back to their house (about a mile and a half away), spent an indefinite period of time there, then went to the grocery store in Columbus. Ewalt drove the route Sherry testified she and Edwards took on May 13,[3] merely pausing for a moment at the Edwards' house, without getting out of his vehicle or spending any time there. He concluded it would have taken Edwards and Sherry about 40 minutes to travel from Lavigne's house to their house and then to the grocery store in Columbus. Ewalt Aff. (Doc. 2-1 at 41-45 ¶¶ 14-29).

If Lavigne arrived home at 5:49 p.m., Edwards would have had to shoot

---

[3] Ewalt's affidavit refers to Sherry's testimony at a pretrial hearing in December 2009, when Sherry testified that after Edwards killed Lavigne, she and Edwards drove back to their house (about a mile and a half away), spent an indefinite period of time there while Edwards cleaned his gun, then drove to a hillside at some distance from the house where Edwards hid the gun, returned to their house, and finally went on to the grocery store in Columbus. *See* Ewalt Aff. (Doc. 2-1 at 41-42 ¶¶ 14-16). At trial, Sherry testified that they went from Lavigne's house to their house to Columbus, and Edwards cleaned and disposed of his gun the day after the murder. *See* Trial Tr. at 307:2-5.

Lavigne immediately on his arrival home, then travel to his house and to Columbus, and also complete his shopping, all in 35 minutes, in order to obtain a grocery receipt stamped 6:24 p.m. But the driving alone, with no shopping, took 40 minutes. Further, when Lavigne's body was found, food was found cooking in the kitchen, as if Lavigne had begun preparing his dinner. *See, e.g.*, Trial Tr. (Doc. 11-7) at 185:14-24. Ewalt opined, therefore, that Edwards could not have killed Lavigne.[4] Ewalt Aff. (Doc. 2-1 at 46 ¶ 32).

Assuming that, as Ewalt said, Edwards did not kill Lavigne at or after 5:49 p.m., this fact is not as decisive as Edwards believes it to be. A rational juror could have decided that Beers' testimony and/or Sherry's testimony were not wholly true. One witness, Don Herzog, testified that he saw Lavigne's van at Lavigne's house at 5:00 or 5:30 that day, when Herzog was on his way to a friend's retirement party in Rapelje. *See* Trial Tr. at 432:2-18, 497:4-499:10. Sherry herself

---

[4] Defense counsel made this argument to the jury. *See* Trial Tr. at 1109:6-13. Ewalt's affidavit spells it out in greater detail.

Ewalt's approach essentially followed the approach law enforcement took to another suspect, Randy Ebberson. At trial, officers testified that Ebberson's work records showed he left work on May 13, 2002, at 6:12 p.m. (Ebberson testified that the records said April 13, not May 13, but apparently it was established to everyone's satisfaction that April was a mistake by the employer and May was meant instead. *See* Trial Tr. at 695:3-696:2). Officers drove both routes Ebberson could have taken to Lavigne's house and found he could not have arrived there until about 7:10 or 7:15 p.m. Sherry called 911 at 7:20 p.m. to report seeing Lavigne lying, apparently dead, at his front door. *See* Trial Tr. at 1019:5-1020:16, 1026:12-19.

Sheriff Brophy, the coroner, testified that rigor mortis would begin two to four hours after death. He arrived at the scene at 9:30 or 10:00 p.m. and noted "some" stiffness in Lavigne's body as he handled it. *Id.* at 219:23-221:10, 250:25-251:9. A pathologist testified that rigor mortis "usually starts within a couple of hours." *Id.* at 392:22. Undersheriff Claunch, the first officer on the scene, arrived between 8:00 and 8:10 p.m. He noted that Lavigne's arm "was stiff for me to lift" when he checked for a pulse. *Id.* at 182:19-23, 1069:12-24, 1071:2-3.

said she really had no clear idea what happened just after the murder. *See, e.g.*, *id.* at 306:12-310:12. Ewalt's affidavit, therefore, does not prove Edwards could not have killed Lavigne.

### 2. Sufficiency of the Evidence

Edwards' claim can also be construed as a claim that the evidence produced at his trial was not sufficient to support his conviction. A state habeas petitioner is entitled to federal habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) (holding that State must "pro[ve] beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged."). Because the jury's role is "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," *Jackson*, 443 U.S. at 319, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution," *id.* at 326. Therefore, the evidence is viewed in the light most favorable to the jury's verdict. *Id.* at 319.

To prove Edwards guilty, the State had to prove that he knowingly or purposely caused Lavigne's death. *See* Mont. Code Ann. § 45-5-102(1)(a) (2001).

To prove tampering with evidence, the State had to prove that Edwards believed an investigation or proceeding was pending or about to begin and destroyed or concealed his handgun so that it would not be available as evidence. *Id.* § 45-7-207(1)(a).

Through Sherry, the State introduced direct evidence that Edwards expressed an intention to kill Lavigne, Trial Tr. at 296:10, and shot him in the head with a handgun, *id.* at 298:10-20. It introduced evidence that Edwards owned a handgun that could not be found as well as evidence that he disposed of it. It introduced evidence that Edwards told others he killed Lavigne. It introduced circumstantial evidence tending to corroborate some of Sherry's testimony. It introduced testimony that no evidence was found to incriminate others who were also suspected as possible culprits. Edwards contested all of this evidence, but a rational juror could have found the State's evidence proved, beyond reasonable doubt, that Edwards killed Lavigne and destroyed or concealed the gun he used to do so.

Claim 1 should be denied.

## B. Claim 2: Ineffective Assistance of Trial Counsel

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Edwards must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of

reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. A reasonable probability is less than a preponderance of the evidence. *Id.* "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

In the wake of *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012), and *Thaler v. Trevino*, __ U.S. __, 133 S. Ct. 1911 (2013), claims of ineffective assistance of trial counsel are beset with procedural complexities. For the sake of simplicity, Edwards' claims against trial counsel are addressed here *de novo*.

### 1. Lack of Preparation to Cross-Examine Sherry

Edwards claims that one of his lawyers was ineffective because she was not prepared. This claim is based on the following exchange, beginning when the State completed its direct examination of Sherry Edwards:

Prosecutor:   I have no further questions at this time.

The Court:   Mr. Duke. I'm sorry. Ms. Sampson.

Counsel:   It's okay.
            I'll be kind of winging it because I wasn't expecting to actually talk to you until tomorrow.
            My name is Stacy Sampson and I'm with the public defenders office. And I represent Richard.

The Court:   Ms. Sampson, you're a bit soft-spoken. You don't have the advantage of a mike, so you might speak up a little bit for the jury.
            I can see them nodding their heads.

| | |
|---|---|
| Counsel: | Okay. I can do that. I didn't want to be too loud and too overwhelming. |
| | As you see, I have this big binder and you've made a lot of statements over the course of the past, I guess, it's been almost eight years now. And so I've got lots of questions for you. . . . |

. . .

| | |
|---|---|
| Counsel: | And I know this is very difficult. You went through a very long, long series of statements whereby you said he [Lavigne] had laid out two or three days? |
| Sherry: | Yes, ma'am. |
| Counsel: | And you had even sworn upon your dead father? |
| Sherry: | Yes, ma'am, I did. |
| Counsel: | And your father meant everything to you, didn't he? |
| Sherry: | Yes, he did. Yes, he did. |
| Counsel: | So even upon your dead father, you lied? |
| Sherry: | Yes, ma'am, I did. And I regret that terribly. I was trying to protect my mother. |
| Counsel: | I'm not asking anything. If you could just . . . . |
| The Court: | Just wait for Ms. Sampson to ask a question, please, Ms. Edwards. |
| Counsel: | And I'm sorry. I'm not as fast or quite as prepared as I had anticipated being. I had honestly not anticipated you testifying until tomorrow. And so I was kind of in pre-prep. |
| | Now at any point in time did you and Richard discuss getting divorced? . . . . |

Trial Tr. at 334:3-16, 338:19-339:16; *see also* Duke Aff. (Doc. 11-24) at 3 ¶¶ 10-11; Stephens Aff. (Doc. 11-23) at 4-6 ¶¶ 21-25; Br. in Supp. of Am. Postconviction Pet. (Doc. 11-31) at 8-11; Sampson Aff. & Ex. A (Doc. 11-32 at 4-9 ¶¶ 5-17, 10-12).

Although Edwards says Sampson failed to present a significant amount of evidence, he identifies one prior statement by Sherry that Sampson failed to bring to the jury's attention. At a pretrial hearing in December 2009, Sherry testified that, immediately following the murder, she and Edwards returned to their house, where Edwards cleaned his gun. They drove to a hillside where Edwards hid his gun, and then they went to Columbus and purchased groceries at 6:24 p.m. *See* Ewalt Aff. (Doc. 2-1 at 41-42 ¶ 15 (citing transcript of pretrial hearing)).

Counsel's omission of this statement was undoubtedly harmless. If Sampson had introduced the statement, the jury might have believed it (assuming it did not believe Beers' testimony), and Edwards still would have been convicted of both deliberate homicide and tampering with evidence. *See* Mont. R. Evid. 801(d)(1)(A); *State v. Torres*, 299 P.3d 804, 810 ¶ 27 (Mont. 2013) (prior inconsistent statements may be substantive evidence). If Sampson had introduced the statement and the jury did not believe it, she would only have further impeached a witness who was already thoroughly impeached by the State, the defense, and Sherry's own testimony about her experience and memory

14

immediately after the murder. The jury knew Sherry repeatedly lied to police and gave several inconsistent accounts. The jury knew that considerable time passed between her claim that Edwards threatened her after the murder, her separation from Edwards in 2005, and her April 2009 statement to police incriminating Edwards. But multiple other statements by Sherry could not lessen the compelling consistency between one of Sherry's accounts of what happened and the evidence found at the scene of the crime. And none of Sherry's other statements could have undermined Edwards' admissions to three other people that he killed a man in Montana.

There is no reasonable probability that the jury would have resolved the truth of Sherry's testimony and Edwards' guilt differently if only Sampson had introduced additional prior inconsistent statements to further impeach Sherry. There is no need to decide whether counsel's performance was deficient.

### 2. Failure to Object to Admission of Edwards' Statements

Edwards also contends that trial counsel should have objected to testimony given by Chris Giller, Richard Sims, and Shelli Barron. Br. in Supp. at 12-13. Each of these witnesses testified that Edwards said he killed a man in Montana. Edwards also told Giller and Sims he had concealed or would conceal the gun. *See* Trial Tr. at 537:3-538:10, 554:13-555:2, 556:4-557:14, 631:13-635:23.

Edwards relies on Mont. Code Ann. § 46-16-215. The statute provides that,

"[b]efore an extrajudicial confession of the defendant to the crime charged may be admitted into evidence, the prosecution shall introduce independent evidence tending to establish the commission of the crime charged."[5]

Lavigne was found with a single gunshot wound to his head. No traces of blood led to or away from the body. No gun lay near the body. The appearance of the crime scene tended to establish that Lavigne did not shoot himself. *See* Trial Tr. at 182:4-184:3. Sherry testified that Edwards killed Lavigne, intended to conceal the gun, and took steps to do so. This evidence tended to establish both deliberate homicide and evidence tampering. All of it was introduced before Barron, Sims, or Giller testified. *See id.* at 2-6 (index showing order of witnesses).

The statute was not violated. Although Edwards does not believe Sherry was credible, the statute does not require (or permit) a judge to condition admission of an extrajudicial confession on his own finding that a witness is credible. Counsel cannot be ineffective for failing to raise a meritless argument. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).

### 3. Failure to Introduce Expert Testimony

#### a. "Blowback"

Edwards asserts that trial counsel should have further undermined Sherry's

---

[5] Contrary to Edwards' claim, Br. in Supp. at 12-13, the statute does not require introduction of independent evidence tending to establish that the named defendant was responsible.

credibility by demonstrating that he and/or his gun would have been bloodied if he had shot Lavigne in the manner Sherry described. This testimony would have been probative, he argues, because Sherry never reported seeing blood on him or the gun.

But, first, defense counsel considered expert testimony and did not believe it would be useful. *See, e.g.*, Duke Aff. (Doc. 11-24) at 2 ¶¶ 5-8; *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).[6] Second, as mentioned, Sherry testified at trial that she did not remember much of anything in the aftermath of the murder. *See, e.g.*, Trial Tr. at 301:8-13, 304:14-17, 312:4-7. In fact, she did not testify that she saw Lavigne fall or anything else after the shot: "everything went white." *Id.* at 301:12. And she apparently testified in the pretrial hearing that Edwards cleaned the gun after the murder.

The facts Edwards alleges do not support inferences either that counsel's failure to introduce this putative testimony was unreasonable or that Edwards was prejudiced as a result.

### b. Identifying the Murder Weapon

Based on a damaged bullet found in the wall at Lavigne's house on a trajectory consistent with Lavigne's injury and Sherry's testimony, investigators believed the murder weapon was a .357 or .38-caliber revolver. Trial Tr. at 605:8-

---

[6] Edwards' postconviction counsel abandoned this claim when they filed the amended petition. *See* Am. Postconviction Pet. (Doc. 11-30) at 1-9.

607:3. Several .357 and .38-caliber firearms belonging to Lavigne's neighbors or acquaintances were tested in the investigation. All but one were found not to have fired the bullet. One, a Ruger .357, "could have or could not have" fired the bullet; the State's firearms expert, Travis Spinder, testified that he "couldn't tell." Trial Tr. at 607:4-609:2.

But Spinder also said that, if he had the weapon actually used to commit the murder, he would be able "definitively" to match the bullet to it. *See* Trial Tr. at 613:12-16. And another State's witness, Agent Knutson, testified:

> Many times in my career I've seen where firearms have been sent in and they've been unable to eliminate the firearm as being the firearm that fired a specific bullet.
> . . .
> Though I'm not an expert in this field, I know that, generally, when they find the firearm that has fired a bullet, they make a conclusive identification of the firearm to the bullet.

Trial Tr. at 1028:16-19, 1029:2-5.

Edwards claims a defense expert should have been called to testify that "the damage to the bullet" lodged in the wall "may have made it next to impossible to identify which gun did or did not shoot the bullet found." Br. in Supp. at 13-14. If that were true, then the Ruger still might have fired the bullet, despite the lack of a "definitive" match.

One could conclude that the issue of the inconclusive Ruger bullet could have been handled better by the prosecution. The Ruger came to police attention

when it was seized from one Brent Edward Johnson in connection with a federal

drug case. Some trial testimony suggested that Edwards was involved with

methamphetamine and/or cocaine, *see, e.g.*, Trial Tr. at 582:22-584:12, 640:3-

643:17, 650:5-22. Other testimony suggested that Shawn Hardtke and Lavigne

were involved with drugs together. *See, e.g.*, *id.* at 778:23-781:19. Agent Knutson

explained how the firearm came to be tested in the Lavigne case:

> [T]here was an article in the Billings Gazette. It was related to a drug
> arrest, where it indicated that the person who was arrested was
> carrying a .357 Ruger firearm.
> . . .
> [I]t was brought to my attention by somebody else within the
> investigation and they wanted to send – wanted to contact a federal
> agency to send it in just because it is one of the makes of a firearm
> that could possibly have fired the round that killed Dan Lavigne.
> Against my better judgment, we sent it in. It has nothing to do
> with this case. There's nothing that has ever drawn us to that gun,
> other than an article in the newspaper that said there was a Ruger
> .357. It was sent in.

Trial Tr. at 1027:4-8, 1028:5-15. Knutson did not follow up on the Ruger in any

way and, in particular, did not interview Brent Edward Johnson. *Id.* at 1027:12-23.

But there is no reasonable probability that Edwards would have been

acquitted if only a defense expert had testified that the Ruger might have fired the

bullet found in the wall. The absence of any other connection between the Ruger

and Lavigne's killing would have overwhelmed any such testimony. A defense

expert who *matched* the Ruger to the Lavigne bullet would be an entirely different

story; but that is not Edwards' claim. He claims only that the defense should have

19

negated the implication that the Ruger was not the murder weapon because it merely might have fired the bullet. The facts Edwards alleges do not support an inference that counsel's failure to call an expert witness was either unreasonable or prejudicial.

### 4. Conclusion

Edwards' claims of ineffective assistance of trial counsel should be denied.

### C. Spousal Privilege

Montana's spousal privilege permits one spouse to stop the other spouse from testifying. *See* Mont. Code Ann. §§ 26-1-802, 46-16-212(1)(a). Edwards objected to Sherry's testifying. But the Montana Supreme Court held that Edwards was not entitled to the protection of the spousal privilege. It said that, to the extent Sherry testified about her observations of Edwards' conduct, the privilege did not apply because observations are not protected marital communications. To the extent Sherry testified about statements that could have been protected marital communications, Edwards accompanied those statements with threats intended to terrify Sherry. Threats are not protected marital communications. *See Edwards*, 260 P.3d at 400-01 ¶¶ 17-20 (citing *State v. Nettleton*, 760 P.2d 733, 739 (Mont. 1988)).

An evidentiary privilege that prevented Edwards from cross-examining a witness might pose a federal issue, *see, e.g.*, *Crawford v. Washington*, 541 U.S. 36,

40 (2003), but Edwards has no federal right to prevent the State from calling competent witnesses to give competent testimony against him. Consequently, the Montana Supreme Court's decisions on the application of Montana's spousal privilege were exclusively within its province. Neither this Court nor the United States Supreme Court may question the Montana Supreme Court's interpretation of Montana law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.'); *Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute.").

This claim should be denied.

### D. *Pro Se* Motions Filed in State Court

Edwards contends that he personally filed a motion seeking new counsel and a new trial about a month after trial but his motion "was virtually ignored." Br. in Supp. at 15. He explains that if the trial court had investigated his reasons for filing the motion and granted new counsel, "new counsel could have motioned the court for a new trial." *Id.* at 16.

To the extent Edwards claims his right to a hearing under state law was violated, *see* Br. in Supp. at 15, he alleges only an error of state law. "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Wilson v. Corcoran*, 562 U.S. 1, 5 (per curiam).

Although the matter is far from clear, the Court will assume, for the sake of argument, that federal due process is implicated when a state court does not consider a motion filed *pro se* by a defendant for the purpose of seeking new counsel. Still, a violation of federal due process must be accompanied by a showing of prejudice. *See, e.g.*, *Hicks v. Oklahoma*, 447 U.S. 343, 345-47 (1980).

Edwards is correct that a defendant generally may file a motion for new counsel and/or a new trial after trial based on counsel's ineffectiveness. *See, e.g.*, *State v. Denny*, 865 P.2d 226, 227-28 (Mont. 1993). But the prejudice he claims is loss of an opportunity to have new counsel seek a new trial. That prejudice was entirely dispelled when Edwards filed a petition for postconviction relief and new counsel was appointed to represent him. At that point, he had the same opportunity to seek a new trial based on ineffective assistance of counsel that he would have had before sentencing if new counsel had been appointed at that time. The grounds described by Edwards in favor of a new trial, *see* Br. in Supp. at 16 (quoting *Edwards*, 260 P.3d at 403 ¶ 31), are typically raised in postconviction proceedings. Edwards lost nothing by the deferral until postconviction proceedings of his opportunity to seek a new trial based on ineffective assistance of counsel.

This claim should be denied.

### E. Ineffective Assistance of Appellate Counsel

Claims of ineffective assistance of appellate counsel are governed by the

same test as claims of ineffective assistance of trial counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Edwards must allege facts sufficient to support inferences both that counsel's performance fell below an objective standard of reasonableness, *Strickland*, 466 U.S. at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. Again, "there is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### 1. James-Ebberson Hearsay

Edwards claims appellate counsel should have appealed the trial court's ruling sustaining the State's hearsay objection to testimony defense counsel attempted to elicit from Lexi James.

### a. Trial Transcript

Appellate counsel cannot raise on appeal matters that are not adequately shown on the record created at trial. *See, e.g.*, Mont. R. App. P. 8(2), 12(1)(d), (h), 12(9); *State v. Norman*, 244 P.3d 737, 743 ¶ 20 (Mont. 2010). Consequently, it is important to know what the trial transcript did and did not show.

In its opening statement, the prosecution told the jury that three witnesses heard Edwards say he shot a man in Montana. Trial Tr. at 155:14-17. The defense, in its opening statement, told the jury that Randy Ebberson also claimed to have

23

killed Lavigne. Counsel said:

> . . . [L]adies and gentlemen, there are other people who had confessed to shooting Dan Lavigne. You will hear from Lexi Frank [sic].[7] Now, Lexi Frank – we have to realize for just a moment we're in 2010 and that this occurred on May 13th, 2002, eight years ago, while Lexi Frank might have a spotty memory today, she did give a statement back in the time period of 2002, 2003.
>
> We do anticipate Lexi Frank coming in and talking to you. Lexi Frank had indicated back at that time period that Randy Ebberson told her that he shot Dan Lavigne. Now, Randy Ebberson – now I realize I'm throwing out a lot of information at once, but the job today is just kind of give you an overview of what we think the evidence will show. And as the days go by these names, the stories and the information I'm giving you will fall into place.
>
> But Randy Ebberson worked out at the Herzog farm. And he worked out there for up to 14 years. And he worked there [sic]. And according to Lexi James that Ebberson lost his job based on Dan Lavigne's activities or conduct, that Randy Ebberson was angry, that Randy Ebberson went and left and shot and killed Dan Lavigne.
>
> That Randy was going to go over and have a talk with Dan Lavigne and that he was going to take his gun and when he came back Randy Ebberson said it wasn't pretty, that he shot him and left him.
>
> We will hear testimony regarding other individuals. . . .

Trial Tr. at 166:10-167:13.

The State called Ebberson in its case-in-chief. In part, Ebberson testified as

follows:

| Prosecutor: | Sir, did you know Mr. Lavigne in any way regarding Herzog employment? |
|---|---|
| Ebberson: | No. |
| Prosecutor: | Did you have any animosity for Dan Lavigne? |

---

[7] The correct last name is James.

| | |
|---|---|
| Ebberson: | No. I talked to him twice. |
| Prosecutor: | Did you ever tell anybody that you had killed him? |
| Ebberson: | No. |
| Prosecutor: | Did you kill him? |
| Ebberson: | No. |

Trial Tr. at 694:18-695:2.

In cross-examination, defense counsel elicited testimony from Ebberson about his acquaintance with Lexi James but did not ask whether he had ever told James that he killed Lavigne. *Id.* at 696:8-702:15, 703:13-704:17.

In its own case-in-chief, the defense called Lexi James, who testified in part as follows:

| | |
|---|---|
| Counsel: | How do you know Randy Ebberson? |
| James: | I met him when I was in the 6th grade and I started training horses with him throughout junior high. |
| Counsel: | Did you live close to him in Rapelje? |
| James: | Yes. |
| Counsel: | How often would you go by and see the Ebbersons? |
| James: | Usually every morning I'd stop by there. |
| Counsel: | Did you have the opportunity to talk to Randy? |
| James: | Yes. |
| Counsel: | And about how many times do you think that you |

visited Randy?

James: I honestly can't keep track. I've known him for years. So . . . .

Counsel: Do you know at any time that you know of that Randy admitted that he killed Dan Lavigne?

Prosecutor: I would object. That calls for hearsay.

The Court: Sustained.

Counsel: Do you know if Randy had feelings against Dan Lavigne?

James: I know that he didn't like him.

Counsel: Do you know if Randy blamed Dan for losing his job?

Prosecutor: I would object to any reference to hearsay. And there's a lack of foundation as to where her personal knowledge comes from.

The Court: Sustained.

. . .

Counsel: Ms. James, who is Lynn Phipps?

James: She's a rancher's wife out near Reedpoint. I used to live with her.

Counsel: How long did you live with her?

James: About three years.

Counsel: Did you ever tell Lynn Phipps that Randy Ebberson had killed Dan Lavigne?

Prosecutor: Your Honor, I object. That is basically trying to

circumvent the hearsay that we're trying to avoid.

The Court:     Sustained.

Trial Tr. at 797:23-799:1, 800:23-801:8.

The following day, outside the presence of the jury, defense counsel asserted

that the trial court erred in sustaining the State's hearsay objections. The trial court

responded:

> The problem with that was it was the Court's view at that time that the
> proper foundation had not been laid for such question. The only thing
> the State asked Mr. Ebberson was whether or not he had shot or
> killed, I believe was the term perhaps used, the decedent and he
> answered no.
>     The State never inquired – and I don't think the defense
> inquired whether he'd ever made a statement to anyone else that he
> had, in fact, killed the decedent. So I don't think there was a
> foundation to ask the question. Now had that been laid earlier on in
> Mr. Ebberson's testimony, my ruling may have been different. And I
> think that comports with the rule.
> . . .
>     . . . But I suspect that Mr. Ebberson should have been asked,
> "Did you ever tell anyone that you killed the decedent?" Had you
> asked that question, then it may have been appropriate. But it is a
> different question than, "Did you kill the decedent," in my judgment.
> So that's my answer for that. And that's what I understood it to be.

Trial Tr. at 859:8-20, 860:3-9.

Asked whether the State's recollection was similar, the prosecutor

responded:

> I'm afraid to assert my recollection, because I have to look up at my
> notes and stuff. But I don't think that – what I can recollect is I don't
> think with regard to either witness they did what I mentioned earlier,
> which is if there were any – if there was any discussion of statements

about killing or shooting with either one of them, there was never the follow-up of do you recall a situation with this person or, you know, identifying a prior inconsistent statement. . . .

*Id.* at 860:14-23; *but see* Mont. R. Evid. 613(b); *State v. Baker*, 300 P.3d 696, 701

¶31 (Mont. 2013) (citing *State v. Lawrence*, 948 P.2d 186, 198-99 (Mont. 1997)).

The defense had subpoenaed Ebberson, and the State did not object to the defense recalling Ebberson to lay foundation for James' testimony. Trial Tr. at 862:9-23. The trial court reiterated both that the defense could "take a look at Ebberson's testimony" to ascertain whether appropriate foundation already existed, *id.* at 864:11-14, 873:12-874:2, and that Ebberson and/or James could be recalled, *id.* at 964:13-965:7, 966:2-6. Counsel responded, "No, I'm not going to [re]call Ms. James." *Id.* at 965:18-19.

### b. Analysis

Unlike federal law, which requires that a prior inconsistent statement be made under oath, *see* Fed. R. Evid. 801(d)(1)(A), Montana law provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . inconsistent with the declarant's testimony." *See* Mont. R. Evid. 801(d)(1)(A); *see also, e.g.*, *State v. Ankeny*, 243 P.3d 391, 400 ¶ 47 (Mont. 2010). Nonetheless, for two reasons, Edwards cannot show that appellate counsel should have raised the James-Ebberson hearsay issue on appeal.

First, the trial court was mistaken in stating that Ebberson was not asked whether he had ever told anyone that he killed Lavigne. But Edwards' trial counsel could have corrected the trial court's mistake. The trial court told him how to do it. Counsel could have asked the court reporter to show that the State's direct examination of Ebberson laid foundation for James' testimony. He could have recalled Ebberson, or James, or both. For whatever reason, trial counsel did not correct the court's mistake.

Second, trial counsel's question to James – "Do you know at any time that you know of that Randy admitted that he killed Dan Lavigne?" – was incoherent. It failed to establish that James personally heard Ebberson make the statement. *See* Mont. R. Evid. 602. An answer in the affirmative could have meant that James heard from someone else that Ebberson said he killed Lavigne. The trial court's ruling that the question elicited a hearsay response was either not wrong, or not prejudicial, or both. For whatever reason, trial counsel did not correct his own mistake by rephrasing the question, and he made no offer of proof.

In sum, the record created at trial did not show that James had non-hearsay testimony to give. The record also did not show that the trial court's mistaken ruling on the issue of foundation "necessarily affect[ed] the judgment," Mont. Code Ann. § 46-20-104(2), because trial counsel had a full and fair opportunity to correct the mistake before closing the defense case-in-chief. On the contrary, the

record showed that trial counsel abandoned the prospect of introducing Ebberson's putative statement that he killed Lavigne.

The facts Edwards alleges do not tend to show that appellate counsel's performance was unreasonable or that Edwards was prejudiced by appellate counsel. This claim should be denied.

## 2. Denial of Motion to Dismiss for Insufficient Evidence

Under Montana law, at the close of the prosecution's case or the close of all the evidence, a defendant may move the trial court to dismiss a charge if "the evidence is insufficient to support a finding or verdict of guilty." Mont. Code Ann.§ 46-16-403 (2009).[8] State law provides that "[g]ranting a motion to dismiss for insufficient evidence 'is only appropriate if, viewing the evidence in a light most favorable to the prosecution, there is no evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Kirn*, 274 P.3d 746, 748-49 ¶ 10 (Mont. 2012) (quoting *State v. Hill*, 189 P.3d 1201, 1206 ¶ 20 (Mont. 2008)).

This test is equivalent to the *Jackson* standard, which was satisfied. *See supra* at Part IV.A. Again, the facts Edwards alleges do not tend to show that appellate counsel's performance was unreasonable or that Edwards was prejudiced

---

[8] The motion is traditionally called a motion for directed verdict or judgment of acquittal, but Montana statutory language controls. *See, e.g.*, *State v. Hanna*, 341 P.3d 629, 636 ¶ 28 n.2 (Mont. 2014); *State v. McWilliams*, 178 P.3d 121, 126 ¶ 36 & n.1 (Mont. 2008).

as a result. This claim should be denied.

## F. Prosecutorial Misconduct

### 1. Transcript of Pretrial Hearing

In connection with this claim, Edwards contends that the transcript of the December 2009 pretrial hearing would be helpful. It is clear, however, that Sherry's testimony at that hearing was inconsistent with her testimony at trial. As explained in Part IV.A, a federal habeas court does not sit to determine which version of a witness's testimony is true or whether any portion of a witness's testimony should or should not have been believed. The jury knew, as does the Court, that Sherry gave multiple, conflicting versions of what happened. It is not necessary for the State to file a transcript that presents yet another version of Sherry's testimony.

### 2. Analysis

Edwards contends that the prosecution and law enforcement committed misconduct by coaching Sherry's testimony. Pet. at 13; *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Napue v. Illinois*, 360 U.S. 264, 269-71 (1959).

It is not unusual for trial testimony to conflict with previous testimony or pretrial statements. Where eight years pass between an incident and a trial relating to it, factors other than perjury may readily explain variations in testimony.

Edwards fails to identify any evidence the State urged the jury to accept as true but that must necessarily be false.

Moreover, all the facts Edwards alleges, *see* Br. in Supp. at 19-22, were presented to the jury at trial, *see generally* Trial Tr. at 998:18-1014:19, including testimony that Sherry saw the autopsy report, *id.* at 1009:15-16.[9] The jury, therefore, knew that Sherry's testimony could have been influenced by what she learned about the case from the State. Its verdict shows that it believed Sherry anyway.

This claim should be denied.

## G. Cumulative Prejudice

Edwards claims that counsel's ineffective assistance and the prosecution team's misconduct cumulatively prejudiced him. Pet. at 14; Br. in Supp. at 22. But "if and when counsel's ineffectiveness 'pervades' a trial, it does so (to the extent we can detect it) only though identifiable mistakes." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). Edwards identifies no prosecutorial misconduct and alleges only one instance of presumably deficient performance by counsel: attorney Sampson's remarks that she was not prepared to cross-examine Sherry. None of Edwards' other claims of ineffective assistance of counsel supports an

---

[9] In the State's case-in-chief, an officer testified that neither Sherry nor any other witness in the case saw State's Exhibit 52, a demonstrative exhibit showing the trajectory of the bullet investigators believed had killed Lavigne. Trial Tr. at 403:7-405:13, 726:17-728:6, 733:8-734:23.

inference that counsel's performance was unreasonable. Prejudice cannot be assessed cumulatively when a petitioner fairly alleges only one instance of presumably deficient performance. This claim should be denied.

### H. Error in Postconviction Proceedings: Claims 8, 9, and 10

Edwards may obtain federal habeas relief only if he shows that it is unconstitutional for the State of Montana to continue hold him in custody. 28 U.S.C. § 2254(a). If Edwards alleged he was entirely deprived of access to a remedy the State of Montana makes available to others for the purpose of challenging conviction or custody, he would be challenging the terms on which the State continues his custody. *See, e.g.*, *Evitts v. Lucey*, 469 U.S. 387, 390-91 (1985) (affirming trial court's issuance of conditional writ "ordering [petitioner's] release unless the Commonwealth either reinstated his appeal or retried him" where indigent petitioner was deprived of counsel on appeal); *Smith v. Bennett*, 365 U.S. 708, 713 (1961). But that is not what Edwards alleges in Claims 8 or 9. Nor could he; Edwards had the same access to state postconviction relief as other Montana state prisoners.

Instead, Edwards' Claims 8 and 9 allege error in postconviction proceedings in the state courts: denial of a hearing and unreasonable factual findings. But "a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings." *Franzen v. Brinkman*, 877 F.2d

26, 26 (9th Cir. 1989) (per curiam). Error is not the same thing as lack of access to the courts or lack of fundamental fairness. The conditions Edwards may be required to meet in order to obtain relief in this Court are spelled out in the governing statutes. *See, e.g.*, 28 U.S.C. § 2254(d)(2), (e). But those statutes are not binding on the state courts and do not provide a basis for release from custody even when their standards are met. *See, e.g.*, *Frantz v. Hazey*, 533 F.3d 724, 735-37 (9th Cir. 2008) (en banc); *id.* at 739 (citing 28 U.S.C. § 2254(a)). Claims 8 and 9 should be denied.

As to Claim 10, alleging that postconviction counsel were ineffective on appeal, Edwards had no federal right to the assistance of counsel to represent him in a postconviction appeal. *See Coleman v. Thompson*, 501 U.S. 722, 755 (1991). Therefore, Edwards cannot show that postconviction appellate counsel deprived him of a federal right. 28 U.S.C. § 2254(a). Claim 10 should also be denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Edwards' jury was persuaded beyond reasonable doubt that Edwards killed Lavigne. The State's case was based on competent evidence that, if believed, supported conviction. Edwards claims the jury should not have believed Sherry's testimony and should have believed other evidence or testimony admitted at trial or submitted in the trial court in postconviction proceedings. But federal habeas courts do not re-weigh evidence or substitute their own findings or judgment for jurors' findings. Reasonable jurists could not find either that Edwards has proved his actual innocence or that the evidence presented by the State failed the *Jackson* test.

Edwards alleges that trial counsel were ineffective in three ways. First, one lawyer said she was not prepared to cross-examine Sherry and failed to introduce some inconsistent statements made by Sherry before trial, but the jury knew Sherry made multiple inconsistent statements and, indeed, lied to police. Second, counsel did not object to three witnesses' testimony that Edwards told them he killed a man in Montana, but counsel had no legal argument to make against admission of that testimony. Third, counsel did not retain experts to show either that Edwards would have been bloodied if he had killed Lavigne in the manner Sherry described or that

it might be impossible to match the bullet found in the wall to any particular gun. But these evidentiary points were slight in comparison to the central evidence in the case. Reasonable jurists would agree that, as to the first claim of ineffective assistance, Edwards fails to show prejudice. As to his other two, he shows neither deficient performance nor prejudice.

Edwards also raises claims regarding spousal privilege, his post-trial, *pro se* motions for new counsel and a new trial, and errors in state postconviction proceedings. But all these claims rely on state law, implicating no federal rights. Likewise, his claim that postconviction counsel were ineffective on postconviction appeal is not cognizable because there is no constitutional or other federal right to effective counsel on collateral appeal.

As to Edwards' claims of ineffective assistance of appellate counsel, the record was not adequate to support admission of testimony that someone other than Edwards claimed responsibility for killing Lavigne, and any reasonable lawyer could have decided not to challenge the sufficiency of the State's evidence.

Edwards does not allege facts sufficient to support an inference that the prosecution or law enforcement officers "coached" Sherry's testimony, and the jury heard and rejected the evidence and arguments Edwards makes in his brief in this Court.

Because Edwards does not show prosecutorial misconduct and alleges facts

sufficient to support an inference only that trial counsel was ineffective in only one respect (the remark about not being prepared to cross-examine Sherry), no showing of cumulative prejudice is possible.

Even assuming that reasonable jurists could disagree with the jury's verdict, reasonable jurists would agree that each of the claims Edwards makes in his federal habeas petition lacks merit. The petition presents no open questions. The law underlying denial of Edwards' claims is well-established. A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

## ORDER

Edwards' motion to require the State to file the transcript of the hearing held in the trial court on December 21, 2009 (Doc. 12) is DENIED.

The Court also enters the following:

## RECOMMENDATION

1. The Petition (Doc. 1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Edwards may object to this Findings and Recommendation within 14 days.[10]

28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo

determination by the district judge and/or waive the right to appeal.

Edwards must immediately notify the Court of any change in his mailing

address by filing a "Notice of Change of Address." Failure to do so may result in

dismissal of his case without notice to him.

DATED this 16th day of November, 2015.

/s/ Carolyn S. Ostby
United States Magistrate Judge

---

[10] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.